UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X

Jamie Williams,

                            Plaintiffs,

          -against-

Amazon.com, Inc., Amazon.com, Sales, Inc., Amazon.com
Services LLC, Christopher Cooper, Chandni Patel, James/Jim
Cummings, Michael Betancourt, Shantay Atkinson, Michael
Gambino, and Aleksey Kash,

                         Defendants.
--------------------------------------------------------------------------X

**JURY TRIAL
DEMANDED**

**21cv924**

**VERIFIED COMPLAINT**

      Plaintiff Jamie Williams (hereafter "Plaintiff"), by his attorney, Anne Leahey, Esq.,
hereby bring this complaint against Amazon.com, Inc., Amazon.com, Sales, Inc., Amazon.com
Services LLC, (collectively "Amazon"),   Christopher Cooper, Chandni Patel, James/Jim
Cummings, Michael Betancourt, Shantay Atkinson, and Michael Gambino, (collectively
"Individual Defendants") (all defendants collectively "Defendants"),  and in support thereof
alleges as follows:

### INTRODUCTION

     1.    During the three years Plaintiff worked  at Amazon, he suffered a continuing
pattern of unremedied specific and related instances of discrimination and retaliation based on
his race (black), gender orientation (gay), and disability (immunocompromised). Although
Amazon upheld Plaintiff's many complaints of illegal, discriminatory treatment, the
discrimination continued, and Plainitff was retaliated against for his complaints.

2.      On January 27, 2020, Amazon issued a report upholding a complaint  Plaintiff had made on December 13, 2019 of  discriminaton and harassment based on gender-orientation and race.  Shortly afterwards, on or about the second week of February, Plaintiff's immediate supervisor began to discipline  him for pretextual performance issues. The pretextual discipline also began after Plaintiff started to complain about Amazon's failure to implement pandemic-safety measures at JFK8, the Amazon facility on Staten Island  where he  worked. Even though Plaintiff is immunocompromised and informed  his immediate supervisor that he had a disability, she and other managers ignored his safety complaints and required him to continue to work  in face-to-face contact with job applicants, administering saliva drug tests. On March 9, 2020, Plaintiff made a formal complaint about the administration of drug tests  during a group meeting. On March 11, 2020, his managers informed him that his performance was unsatisfactory and gave him a "Pivot Entry," a document stating that he could be fired in thirty days with less severance pay than if  he agreed to leave the company within  five days. Plaintiff's last day at Amazon was March 21, 2020.

3.      Plaintiff brings this action for discrimination based on race, gender, and disablity; for retaliation for complaining about race-based, gender-based, and disability-based discrimination; and for retaliation for objecting to Amazon's refusal to implement safety measures in violation of New York Labor Law § 200 and Guidance from the U.S. Centers for Disease Control and Prevention ("CDC"). As a result of Amazon's illegal discrimination and retaliation, Plaintiff was denied a reasonable accommodation and subjected to material adverse actions, including a hostile work environment, culminating in his termination on March 21, 2020, in violation of Title VII of the Civil Rights Act of 1964, 42 USC § 2000e, *et seq.*; the Civil

Rights Act of 1991, 42 USC § 1981; Title I of the Americans with Disabilities Act ("ADA") of 1990, 42 U.S.C. 12111, *et seq*., and Title V, Section 503 of the ADA, 42 U.S.C. 12203; the New York State Human Rights Law,  Executive Law § 290, *et seq*.; New York City Human Rights Law, NYC Administrative Code § 8-107; and New York Labor Law §§ 215 and 740.

## THE PARTIES

4.     Plaintiff Jamie Williams is a black, gay male who resides in Newark, New Jersey and who worked for Amazon prior to his termination on March 21, 2020 at JFK8 - Amazon Fulfillment Center, 546 Gulf Ave, Staten Island, NY 10314. He suffers from a physical disability but was able to fulfill his job responsibilities at Amazon with reasonable accommodations involving workplace hygiene and safety precautions. At all relevant times, Plaintiff met the definition of "employee" and/or "eligible employee" under all applicable statutes.

5.     Defendant Amazon.com Services LLC has a principal place of business at 410 Terry Ave. North, Seattle, WA, 98109-5210, is licensed to conduct business as a corporation within New York state, and maintains multiple business facilities within New York State, including a warehouse and distribution center at JFK8 - Amazon Fulfillment Center, 546 Gulf Ave, Staten Island, NY 10314.

6.     Defendant Amazon.com Sales, Inc. is the sole member of Amazon.com Services LLC, and is a Delaware corporation with its principal place of business in Seattle, Washington.

7.     Defendant Amazon.com, Inc. is the sole owner of Amazon.com Sales Inc., and is also a Delaware corporation. Its headquarters are located at  410 Terry Ave. North, Seattle, WA, 98109-5210 and its   principal place of business is located at 1200 12th Avenue South, Suite 1200, Seattle, Washington 98114-2743.

8.    Defendants Amazon.com Services LLC, Amazon.com Sales, Inc., Amazon.com, Inc. and Amazon.com LLC are collectively referred to as "Amazon."

9.    Amazon transacts business in New York State at JFK8 - Amazon Fulfillment Center, 546 Gulf Ave, Staten Island, NY 10314.

10.   Defendant Christopher Cooper is a black man who is employed by Amazon as the Talent Supply Chain Engagement Director of the North East Workforce Staffing and whose business addresses include Amazon Sort Center EWR5, 301 Blair Rd, Avenel, NJ 07001.

11.   Defendant Chandni Patel is a white woman (East Asian) who is employed by Amazon as the Talent Supply Chain Engagement Lead at EWR 5 and whose business address is Amazon Sort Center EWR5, 301 Blair Rd, Avenel, NJ 07001.

12.   Defendant James/Jim  Cummings is a white man who is employed by Amazon as the Talent Supply Chain Regional Manager and whose business address is Amazon Sort Center EWR5, 301 Blair Rd, Avenel, NJ 07001.

13.   Defendant Michael Betancourt is a white man who is employed by Amazon as the Talent Supply Chain Engagement Manager and whose business address is Amazon Sort Center EWR5, 301 Blair Rd, Avenel, NJ 07001.

14.   Defendant Shantay Atkinson is a black  woman who is employed by Amazon as the Talent Supply Chain Engagement Lead and whose business address is Amazon Fulfillment Center - EWR8, 698 US-46 W, Teterboro, NJ 07608.

15.   Defendant Michael Gambino is a white man who is employed by Amazon as an Operations Manager at JFK8 - Amazon Fulfillment Center, 546 Gulf Ave, Staten Island, NY 10314.

16.     Defendant Aleksey Kash is a white man who, on information and belief, is employed by Amazon as a Senior Operations General Manager and whose business address is Amazon Fulfillment Center - LGA7, 380 Middlesex Ave, Carteret, NJ 07008.

## JURISDICTION AND VENUE

17.     This Court has federal subject matter jurisdiction over Counts One, Two, Three, Four, Five, and Six of the Complaint pursuant to 28 U.S.C. §§ 1331and 1343(a)(4).

18.     This Court has supplemental jurisdiction over Counts Seven, Eight, Nine and Ten of the Complaint pursuant to 28 U.S.C. § 1367.

19.     On December 29, 2020, the United States Equal Employment Opportunity Commission issued to Plaintiff a Notice of Right to Sue, which is attached hereto.

20.     This Court has personal jurisdiction over the Defendants because they transact business within the State of New York, and have engaged in wrongful acts within the State of New York.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and injuries giving rise to Plaintiff's claims occurred in this district.

## FACTUAL BACKGROUND

**Plaintiff's Initial Employment in 2017: Two founded incidents of discrimination**

22.     After graduating from the New Jersey Institute of Technology in 2016 with dual degrees in marketing and international business, Plaintiff applied for a managerial position at Amazon. From a pool of over ten thousand candidates, Plaintiff was one of fifty candidates chosen to go to Washington, DC for a series of panel interviews for twenty-five positions. In addition to paying for Plaintiff's travel and hotel expenses, Amazon gave him five hundred

dollars ($500.00) in spending money for clothing and other necessities. On September 19, 2016, Amazon offered Plaintiff a position as an Area Manager in Operations at the level of L4.

23.     It took several months for Amazon to place its new hires. On May 1, 2017, Plaintiff began working for Amazon at a fulfillment center, LGA7, in Carteret, NJ. He started at a yearly salary of $55,000, with full benefits, stock options, and a sign-on bonus of $16,000. On his first day, during orientation, he met his hiring manager, Christopher Cooper, an L7 in Operations. Cooper was a harsh, black man from Nigeria, who discriminated against other black people on the basis of race.

24.     As an Area Manager, Plaintiff was responsible for overseeing sixty people who engaged in light industrial work, processing inbound and outbound merchandise. Plaintiff's job was to make sure workers functioned as efficiently as possible and met a set rate of production. For every shift, Plaintiff would walk 20-30 miles in his area of the warehouse with a computer attached to his arm, measuring and monitoring progress without any sit-down areas or opportunities. If Plaintiff tried to walk off the floor for a fifteen-minute lunch break, to which he was entitled, his first manager, a white man named Aleksey Kash (surname may be incorrect), would electronically harass Plaintiff with inquiries about work and/or what Plaintiff was doing. Similarly situated white employees were not subjected to such harassing inquiries.

25.     On or about July 2017, Aleksey assigned Plaintiff to "shadow" two white employees, Benjamin (surname unknown) and Benjamin's assistant, Corey (surname unknown), which meant that Plaintiff was supposed to learn his employment obligations by observing and assisting Benjamin and Corey as they worked. However, Benjamin and Corey positioned Plaintiff in isolated areas and were unavailable to give Plaintiff the systematic training he needed

to perform his job, including learning how to operate Amazon's software. Whenever Plaintiff looked for Benjamin and Corey, they were outside smoking vape cigarettes, and when they returned to work, they were stoned. Plaintiff complained to Aleksey that he was being sidelined, was not learning the job, and was being forced to do manual labor instead of managerial work, but Aleksey ignored Plaintiff's complaints. At some point in August of 2017, Plaintiff learned that Aleksey and Benjamin were best friends.

26.     Just before Labor Day Weekend in 2017, Plaintiff made multiple telephone calls to the 800 number for Amazon's Ethics Department in Seattle, Washington, leaving concerned messages, complaining that it was unethical for Aleksey and Benjamin to be working so closely when they were best friends, and charging that the two were discriminating against Plaintiff based on his sexual orientation and race.

27.     Amazon upheld Plaintiff's complaint for race-based and gender-based discrimination. Melissa Ford, who was a Human Resources (HR) Vice-president, during this time period, informed Plaintiff that HR had determined that his complaint was founded. She also told Plaintiff that Aleksey was prohibited from communicating with Plaintiff in any way.

28.     In September 2017, Plaintiff was reassigned to report to Michael Gambino, a newly hired white manager at the L6 level. Gambino, as Plaintiff's new supervisor, approached Plaintiff, who was performing manual labor by himself at the isolated end of the warehouse, and informed Plaintiff that Gambino knew what Plaintiff had gone through and that things would improve. Initially, Plaintiff's work environment did improve inasmuch as Gambino assigned Plaintiff to shadow someone who provided training. However, Gambino himself was assigned to shadow Aleksey, who, at that point, Aleksey was an L6 in a "stretch" position, which meant

Aleksey was moving towards L7. Gambino fell under Aleksey's influence and began to treat Plaintiff with hostility based on Plaintiff's gender orientation and race, stymieing Plaintiff's training and relegating Plaintiff to entry level work.

29.     On or about the beginning of October 2017, an ugly incident occurred with Gambino. Plaintiff was standing directly in front of one of his associates,  a Hispanic woman, and talking to her about her performance. A white Assistant Manager at the L-3 level named Chelsea (surname unknown) was standing to Plaintiff's immediate left. Plaintiff noticed that Chelsea was laughing and that the associate to whom he was speaking was looking over Plaintiff's shoulder at something that caused her to look down.  Plaintiff whipped his head around and caught Gambino standing behind him in the act of making facial expressions that imitated Plaintiff in a derogatory, undermining way, mocking Plaintiff for being gay and black.

30.     In disbelief, Plaintiff asked Gambino, "What are you doing? Are you undermining me with  an associate?" Plaintiff immediately walked to Human Resources where he reported the disturbing behavior. It turned out that the incident had been caught on a video camera and was an undeniable expression of hostility directed at Plaintiff's sexual orientation and race. Amazon Human Resources therefore reached a determination that Gambino had subjected Plaintiff to discriminatory treatment based on gender orientation and race and directed Gambino not to communicate with Plaintiff.

31.     This founded incident, as well as the previous founded incident involving Aleksey, caused Christopher Cooper (Plaintiff's hiring manager) to summon Plaintiff to a meeting. Even though there were now two founded incidents of illegal discrimination against Plaintiff,  Cooper did not address the discriminatory atmosphere that Plaintiff was experiencing

and instead aggressively grilled and berated Plaintiff, informing Plaintiff that he was not going "to make it." Plaintiff held his ground and pushed back against the retaliation he was experiencing for complaining about disparate treatment. He told Cooper that he felt he was being discriminated against because he was gay and black, that doing entry work -- such as pushing 100 pound plus bales -- was not part of his job as an Area Manager, and that he was being deprived of the training he needed to do his job. Plaintiff requested that Melissa Ford come into Cooper's office to confirm to Cooper that Plaintiff had been mistreated. When Ford arrived, Cooper refused to listen to her and abruptly left the office. Plaintiff then told Ford that he was planning to transition to a job in staffing in Human Resources and was already in the process of looking for another role.

32.     Plaintiff, as a result of Plaintiff's founded complaint against Gambino, was instructed in October 2017, to report to Ali Nhazi, an Indian manager, who reported to Cooper . Under Nhazi, Plaintiff's prospects improved. He no longer had to deal with Aleksey, Gambino, or Cooper, and Nhazi supported Plaintiff's career at Amazon. Nhazi knew about Plaintiff's applications for other positions and encouraged his efforts.

33.     In order to apply for other positions within the Amazon system, an employee must be in good standing. Plaintiff met this bar since all of his performance reviews were perfect. Indeed, Gambino, despite his mistreatment of Plaintiff, gave Plaintiff an excellent review.

34.     On or about the end of October 2017, Plaintiff applied for a senior staffing position in Human Resources. Plaintiff referred the recruiter to Nhazi, who vouched for Plaintiff as a good worker. After that, Plaintiff passed a 3-panel interview. The open position was given to an Indian woman named Chandni Patel, but, on November 9, 2017, Plaintiff received an

"incline" for the position. This meant that if the position opened anywhere in the country during the ensuing three months, Plaintiff could request to fill it. However, it was now Amazon's peak season during which there was very little transitioning within the company. After the holiday season ended, in January 2018, Plaintiff reached out again to the hiring manager who had given Plaintiff the incline for the senior staff position. The hiring manager informed Plaintiff that another position was now available in EWR5, the place that Patel was working. Plaintiff happily accepted this opportunity.

### 2018: Founded Discrimination and Retaliation at EWR5

35.     On March 5, 2018, Plaintiff started his new position in Amazon's Human Resources Division of Workforce Staffing. At the time, the Division of Workforce Staffing was a new part of Amazon. Previously, Amazon had depended on third-parties agencies to conduct its entry level or Level 1 ("L1") hiring. The Division of Workforce Staffing was now responsible for hiring all incoming entry-level positions in the five division lines of fulfillment, sort, delivery, pantry and prime, and delivery drivers.

36.     Plaintiff was assigned to work at EWR5, a Sort Center in Avenal, NJ. His title was initially Senior Staffing Coordinator, but, a few weeks into the job, the title for Plaintiff's position changed to Talent Supply Chain Engagement Senior Coordinator. He was initially partnered with Defendant Chandni Patel, who had started in the position of Senior Staffing Coordinator a few months before Plaintiff. The two sat in the same office and had a friendly relationship.

37.     Plaintiff's new position required two components: (1) a New Hire Event, referred to as NHE, and (2) New Hire Orientation, referred to as NHO. When Plaintiff began working in

staffing at EWR5, he carried out the NHE  component and Patel carried out the NHO component. Plaintiff's NHE duties included collecting IDs, interviewing candidates, giving a presentation about the  job position and environment, and administering a drug test.

38.     Plaintiff and Patel reported to Shantay Atkinson, a black female. Numerous employees made founded complaints against Atkinson, including: Plaintiff; Defendant Patel; a mixed race woman (black/white) named Searra Pirolo; and a white man named Michael Bartolomci. However, Atkinson's mistreatment of Plaintiff far exceeded her mistreatment of other employees and was directed at him because of his sexual orientation and race.

39.     Atkinson made Plaintiff's work environment intolerable on a subjective and objective basis. First, she constantly harassed him with personal comments directed at his being a gay, black man. Stomping her feet on the ground, she screamed at him that she "hated him," could not "stand him," and wanted "to get rid of him," comments he recorded. Atkinson, who is obesely overweight, also repeatedly mocked Plaintiff for being gay with inappropriate,  personal comments about, among other things, his slim build.

40.     Second, Atkinson actively tried to get Plaintiff fired by assigning him to New Hire Events (NHEs) without adequate support. If an employee was doing the NHE component of entry-level hiring by himself, there was supposed to be a ratio of 15 candidates to 1 staff member, which meant that no more than fifteen candidates could be scheduled for processing in a two-hour session. However, Atkinson routinely scheduled Plaintiff to process as many as 200 candidates at a time  -- there was even an occasion at Staffmark Agency in New Jersey when Plaintiff was scheduled to possess over 500 candidates.

41.     As a result of the impossible workload and unrelenting harassment, Plaintiff's health suffered. After complaining to Human Resources in Seattle without redress, he took a medical leave of absence, starting on October 4, 2018.

42.     On November 6, 2018, Plaintiff texted Atkinson's supervisor, a white woman named Kelliann Wilson, asking if he could speak to Wilson about his future at Amazon. Wilson was an L6 with oversight responsibility for the upper states, New York, New Jersey, and Pennsylvania. His text described Atkinson's harassment of him and his concern that Atkinson would continue to make his work environment intolerable.

43.     Shortly after Plaintiff's text to Wilson, Plaintiff and Wilson spoke on the phone. Wilson was familiar with the many complaints lodged against Atkinson by her subordinates and therefore was receptive to Plaintiff's description of Atkinson's harassment.

44.     On January 15, 2019, Plaintiff texted Wilson to ask her to help him return to Amazon under a different manager, and Wilson made this happen with the support of another senior manager who knew and respected Plaintiff, thereby demonstrating that they believed and upheld his complaints about Atkinson. Plaintiff could not have been moved to a different manager if his complaints had been founded.

**2019: Discrimination and Retaliation at JFK8**

45.     Plaintiff returned to Amazon from medical leave on February 9, 2019. For the first two weeks after his return, he was assigned to his prior work location, EWR5 in New Jersey, where he again worked alongside Patel.

46.     When he returned to work, Plaintiff did not report to Atkinson and instead reported to KelliAnn Wilson on an interim basis. She offered him the choice of working in the

Division of Workforce Staffing at either:  the Amazon Fulfillment Center at JFK8 on  Staten Island, which fell within the New York region;  or at EWR5, which fell within the region of Southern New Jersey. He chose to work at JFK8.

47.     On or about the first or second week of March 2019, Plaintiff started working at JFK8 where he directly reported to a white man named Jason Miller. However, Plaintiff continued to report indirectly to Wilson, who treated him fairly and with whom he had a good relationship. She provided his employment evaluations and told him he was doing an awesome job and "to keep up the good work."

48.     As a gay, black man, Plaintiff did not feel safe enough in any of the neighborhoods on Staten Island to leave the facility to get lunch, and did not feel comfortable at JFK8 due to the lack of  diversity among Amazon staff at the higher levels. Most of the minority employees at JFK8 were at the L1 or L2 level.

49.     Before working   at JFK8, Plaintiff had  performed only the New Hire Event (NHE) component of staffing. Once he was at JFK8, he asked to learn the New Hire Orientation (NHO) component. He was therefore assigned to shadow a Mexican woman named Rosanna Rodriquez and promptly became proficient in the NHO part of the job.

50.     On or about March or April 2019, Cooper, now an L8, who as discussed above had been Plaintiff's hiring manager, moved from Operations to Workforce Staffing, where he became responsible for the entire North East Region. When this happened, JFK8 was moved from the New York Region to the New Jersey Region. For Plaintiff, this meant he was no longer interfacing with West 34th Street in Manhattan, and was instead interfacing with EWR5 in Avenal, NJ, where he had been very unhappy. He was also indirectly reporting to Cooper, an

individual who had discriminated and retaliated against him based on race and gender orientation.

51.     In addition, on or around late April/May  2019, Wilson was replaced by James Cummings, a white man. Cummings and Cooper had previously worked together in Operations and had a close relationship.

52.     Shortly afterwards, on or about May of 2019, Plaintiff was assigned a new manager,  Michael Betancourt,  an L6, whose title was Talent Supply Chain Engagement Manager,  a position on the same level as Atkinson's. Betancourt was a white man who, like Cummings, had a military background, and the two men, who had  previously worked together in Operations, had a close relationship.

53.     Accordingly, as of the Spring of 2019, Plaintiff reported to Betancourt, who reported to Cummings, who reported to Cooper, a chain of men who shared a homophobic and racist  attitude.

54.     When Betancourt became Talent Supply Chain Engagement Manager at JFK8,  he sent out a group email stating that he wanted to meet one-on-one with each of his employees. When Plaintiff met with Betancourt, Betancourt began the meeting by stating that he had spoken with Atkinson and knew that she wanted to get rid of Plaintiff. Betacourt said that Atkinson had it "out for" Plaintiff and that Atkinson wanted Betancourt to put Plaintiff on "the chopping block." This shocking introduction alerted Plaintiff to the reality that he was going to be facing retaliation from Betancourt for having complained about Atkinson's illegal, discriminatory treatment of him.

55.     Plaintiff immediately met with  Cummings, explaining that  he  was concerned about finding himself in the same hostile, discriminatory environment he had endured under Atkinson. Cummings responded by urging Plaintiff to "give it a chance" and "try it out." Then, suddenly, Cummings informed Plaintiff that Cummings had a daughter who was gay. While Plaintiff was somewhat alarmed by this comment, he initially thought that Cummings was interested in creating fair and nondiscriminatory working conditions for Plaintiff. However, Plaintiff's perception of Cummings changed as Betancourt began an unchecked and unremedied pattern and practice of harassing Plaintiff for being gay and black  and of  retaliating against Plaintiff for coomplaining about illegal discrimination.

56.     Whenever Betancourt  was at JFK8, he would single Plaintiff out, give him a negative critique on something minor,  and/or  comment on Plaintiff's gay life style.

57.     Betancourt would make tasteless gay slurs and jokes on virutally every occasion he saw Plaintiff. On or about June of 2019, Betancourt, upon learning that Plaintiff had lived in San Diego for a few years and would drive his female roommate to the military base where she was a marine, said to Plaintiff, "I know what you were looking at there!" Betancourt then scornfully told Plaintiff that Plaintiff was looking at the "cocks" of the soldiers on the base.

58.     On other occasions, Betancourt would ask Plaintiff if a  man walking by  was his type. Betancourt would also ask Plaintiff in a snide tone when Plaintiff was going to get married.

59.     Betancourt's pattern and practice of sexual harassment extended to female employees to whom he directed inappropriate, sexual remarks. Indeed, upon information and belief, while Plaintiff was working under Betancourt, Amazon upheld a complaint of sexual

harassment against Betancourt that was lodged by    Rosanna Rodriquez (the woman whom Plaintiff had shadowed to learn NHO).

60.    In addition to making harassing, homophobic remarks to Plaintiff, Betancourt sent Plaintiff constant, harassing emails, often starting at 6 AM, on which Betancourt copied the entire staff. In these emails, Betancourt would criticize Plaintiff for behavior for which similarly situated straight, white  employees were not criticized. For instance, Bettancourt would question whether Plaintiff was entering the correct time when he logged into work. As another instance, when Plaintiff's hiring event ran 15 minutes over, Betancourt sent him a reprimanding email. During that same week Kris Koller, a white woman at the L3 level who worked in Plaintiff's office area, had a hiring event that ran 45 minutes over; she bragged out loud that Bettancourt had not reprimanded her the way he had reprimanded Plaintiff.

61.    On or about July 2019, Chandni Patel, with whom Plaintiff had partnered under Atkinson, was promoted from L4 to to L5 and became his immediate supervisor for the remainder of his tenure at Amazon. She gave Plaintiff excellent performance evaluations and encouraged him to apply for L5 positions. When Plaintiff would respond to a harassing email from Betancourt, Patel would often support his response, saying "I'm glad you responded like that."

62.    However, Patel reported to Betancourt and was obligated to take his direction. On many occasions, Plaintiff observed Patel emerging in tears from Betancourt's office.

63.    Throughout July, August, October, November, and December of 2019, Betancourt continued to make offensive remarks to Plaintiff and to send Plaintiff harassing emails.

64.     In addition to subjecting Plaintiff to an illegal hostile work environment that was objectively and subjectively intolerable, Betancourt also subjected Plaintiff to an adverse employment action based on his gender orientation and race.  On or about September of  2019, Chris Miller, a white man, started working at Amazon as an L4 in Staffing at JFK8 in the same office area where Plaintiff and Kris Koller  worked. As soon as Miller started at JFK8, Betancourt disparately favored Miller over Plaintiff by making Miller the Point of Contact (POC) person for staffing, notwithstanding that Plaintiff had seniority, that Plaintiff had been requesting the assignment, and that Miller had  no experience at Amazon.  The POC was responsible for the entry level staffing for different buildings in different locations and was  the contact person for any issues in staffing persons at JFK8.

65.     Miller became POC during Amazon's busiest period,  the months of October, November, and December,  when Amazon does its most hiring. Because POC was considered to be a stretch position towards L5 and because Amazon uses POC performance as a measure of job competence, it was extremely advantageous for Miller to become the POC during these months.

66.     Plaintiff complained to Patel and Cummings about his differential treatment,  and they responded by making Plaintiff POC from January 2020 until March 5, 2020.  This was a blow to Plaintiff's career at Amazon because  Plaintiff became the POC during Amazon's slowest season, which started right after Christmas, when there was very little hiring. Essentially, Plaintiff's chances of   moving towards an L5 were, compared to Miller's, significantly hindered by Miller's disparate advancement over Plaintiff.

67.     On or about November 2019, Cummings requested to speak to Plaintiff about Plaintiff's complaints about the  discriminatory, harassing treatment he was receiving for being a

gay, black man. Instead of offering Plaintiff assistance, Cummings suggested that Plaintiff should leave Amazon and return to Memphis, Tennessee, his home town. Plaintiff responded that he loved Amazon, did not want to leave, and was pursuing L5 virtual opportunities where he would be judged for his work performance, not for his gender orientation and race. Cummings told Plaintiff to "go for it."

68.     On December 13, 2019, Plaintiff made a formal complaint to Human Resources about the disparate treatment he was experiencing from Betancourt and Cummings. He complained that Betancourt was harassing him and treating him disparately because of his race and gender orientation. Among other things, Plaintiff complained about Betancourt's constant singling Plaintiff out, about Betancourt's emails, and about Betancourt's offensive comments including the comment about Plaintiff's interest in "cocks" at the military base in San Diego. Plaintiff also complained that Miller had been unfairly promoted over him and that Plaintiff was being overlooked and not given learning opportunities.

**January 27, 2020: Plaintiff's Discrimination Complaint is Upheld**

69.     On January 27, 2020, Plaintiff received an email from Kathleen Bower, HR Business Partner, informing him that she had acted as a "fair and objective fact finder" and had conducted a "thorough investigation" of his complaint on December 13, 2020. She said she had "spoke[n] with relevant parties and reviewed relevant documentation." After completing "a thorough investigation," she "found a violation of Amazon policy or standards of conduct." She said that Amazon had "taken appropriate action to address the violation." She concluded that "Amazon has a policy prohibiting retaliation against anyone who has raised a complaint."

70.     After receiving this email, Plaintiff had a long conversation with Bower who told him that he no longer had to communicate with Cummings or Betancourt and that they were not to communicate with him.

71.     Plaintiff's immediate supervisor, Patel, reiterated this to him during a long meeting. She also told him that he was on track for an L5 position and was immediately going to start shadowing her in a stretch position.

72.     Plaintiff had begun to apply for L5 positions even before the investigation came back founded. Patel was well aware of this because managers were copied on all job applications made by their staff. She encouraged his job applications and even had him sit next to her at her computer to search for L5 jobs. However, as shown next, Patel was instrumental in fabricating pretextual grounds for terminating Plaintiff.

**February to Early March 2020: Pretextual Discipline and Disparate Treatment**

73.     In the last few weeks of February 2020, shortly after Bower's January 27th email upholding Plaintiff's complaint of discriminatory treatment based on race and gender orientation, Partel issued pretextual disciplinary write-ups to Plaintiff for three alleged performance issues, which Amazon termed violations of "customer obsession."

74.     The first disciplinary write-up involved a blind candidate who appeared without advance warning at a new hiring event on or around February 2020. Plaintiff immediately reached out to Patel through Chime, which is Amazon's virtual meeting platform, to ask for the proper protocol. She told him to reschedule the candidate, and Plaintiff politely and respectfully did so. Plaintiff then spoke with a woman on the other end of the candidate's cell phone and politely and respectfully informed her that the candidate had been rescheduled. A few days later,

this woman called Amazon to complain about the rescheduling, not about Plaintiff's treatment of the candidate. Patel then wrote Plaintiff up for the incident. Plaintiff was shocked, and asked what was going on since Plaintiff and Patel had discussed the situation beforehand and Plaintiff had carried out Patel's instructions.

75.     It was in this context that Plaintiff brought up his own disability to Patel. Plaintiff explained that he himself has a blind disability, referencing his being immunocompromised, and explained that he was therefore especially sensitive to the candidate's disability and had treated the candidate respectfully. Indeed, in 2012, Plaintiff was deemed disabled by the State of New Jersey and received disability benefits until he started at Amazon.

76.     The second disciplinary write-up involved a candidate who was forty-five minutes late for an orientation on or around February 2020. The security guard informed the candidate that she could not attend the event because she was more than fifteen minutes late. When the candidate insisted on being admitted, the guard got Plaintiff, who came out of the orientation and politely explained to the candidate that the rule was that a candidate could not participate in orientation if she was more than 45 minutes late. The candidate was upset and called Amazon to complain. Patel wrote Plaintiff up for this incident even though the security guard spoke to Patel and explained to Patel that the candidate had been 45 minutes late and that Plaintiff had acted appropriately as could be verified by the security camera which had captured the incident. The security guard asked Patel, "Why do you all keep messing with Plaintiff? Why don't you all leave him alone?"

77.     The third disciplinary write-up was dredged up from September or October of 2019, months before the actual write-up. It involved a young white male who arrived at a new

hiring event in an irate and boisterous state. Plaintiff bore with the candidate's disruptions patiently, until the drug test, when the young man kept taking the swab out of his mouth and refused to keep it there for the requisite ten minutes. At that point, Plaintiff politely informed the candidate that he would have to reschedule. Even though Plaintiff had acted professionally, Plaintiff was disciplined for this incident in February 2020, approximately four months after it occurred, demonstrating how far back Amazon had to look to come up with its third flimsy charge against Plaintiff.

78.     Not only were the three disciplinary write-ups unsubstantiated, but also Plaintiff was treated differently than similarly situated white and straight comparators who were not disciplined for substantiated misbehavior. Ricardo Jimenez and Melissa (surname unknown), at the L4 level, and Kris Koller, at the L3 level, were straight white people who performed the same work as Plaintiff. Jimenez, Melissa, and Koller were frequently abrasive and rude to candidates, but none was ever disciplined for his or her behavior. In contrast, Plaintiff was disciplined for behaving appropriately in three challenging situations.

79.     Further, Plaintiff continued to be treated in a discriminatory and retaliatory way after receiving HR's finding of discrimination on January 27, 2020. For instance, even though Plaintiff was the Point of Contact (POC) person from January 2020 to March 5, 2020, he was, for discriminatory and retaliatory reasons, excluded from the weekly labor order meetings, at which HR staff, including Betancourt, and a high level person from Operations, determined staffing needs through analysis of systems that show volume of orders. These meetings were attended by the white, straight male, Chris Miller, when he was POC, but not by Plaintiff, when he was POC.

80.     In addition, even though Betancourt was not supposed to be in contact with Plaintiff after January 27, 2020, Betancourt continued to harass Plaintiff.  For instance, on or about the beginning of March 2020, Betancourt sent Plaintiff an angry email, on which the entire staff was copied, accusing Plaintiff of conducting an orientation that lasted two and a half hours instead of two hours and demanding an explanation. Plaintiff, who was the POC of Workplace Staffing at the time,  replied that the meeting ran over because  he was with Patel  and was introducing Patel to the new POC of HR; Plaintiff also provided a full professional explanation answering Betancourt's questions about procedures. In contrast,  Kris Koller, the white woman who worked in Plaintiff's area, frequently ran orientation meetings that lasted more than two hours,  never got reprimanded for doing so, and would instead receive a blast email from Betancourt saying, "Great job!"

**February 2020: CDC COVID Guidelines**

81.     Patel began issuing pretextual disciplinary write-ups to Plaintiff after he started complaining to  Amazon that it was not following basic procedures which the U.S. Centers for Disease Control and Prevention ("CDC") recommended for workplace safety at the beginning of the pandemic.

82.     The CDC  issued guidance in February 2020 that employers should "[a]ctively encourage sick employees to stay home" and provided the following guidelines:

- Employees who have symptoms of acute respiratory illness are recommended to stay home and not come to work until they are free of fever (100.4° F [37.8° C] or greater using an oral thermometer), signs of a fever, and any other symptoms for at least 24 hours, without the use of fever-reducing or other symptom-altering medicines (e.g. cough suppressants). Employees should notify their supervisor and stay home if they are sick.
- Ensure that your sick leave policies are flexible and consistent with public health guidance and that employees are aware of these policies.

- Talk with companies that provide your business with contract or temporary employees about the importance of sick employees staying home and encourage them to develop non-punitive leave policies.
- Do not require a healthcare provider's note for employees who are sick with acute respiratory illness to validate their illness or to return to work, as healthcare provider offices and medical facilities may be extremely busy and not able to provide such documentation in a timely way.
- Employers should maintain flexible policies that permit employees to stay home to care for a sick family member. Employers should be aware that more employees may need to stay at home to care for sick children or other sick family members than is usual.

83.    Also in February 2020, the CDC issued guidance that employers should

"[s]eparate sick employees" and provided the following guideline:

- CDC recommends that employees who appear to have acute respiratory illness symptoms (i.e. cough, shortness of breath) upon arrival to work or become sick during the day should be separated from other employees and be sent home immediately. Sick employees should cover their noses and mouths with a tissue when coughing or when coughing or sneezing (or an elbow or shoulder if no tissue is available).

84.    Also in February 2020, the CDC issued guidance that employers should

emphasize "staying home when sick, respiratory etiquette and hand hygiene by all employees"

and provided the following guidelines:

- Place posters that encourage staying home when sick, cough and sneeze etiquette, and hand hygiene at the entrance to your workplace and in other workplace areas where they are likely to be seen.
- Provide tissues and no-touch disposal receptacles for use by employees.
- Instruct employees to clean their hands often with an alcohol-based hand sanitizer that contains at least 60-95% alcohol, or wash their hands with soap and water for at least 20 seconds. Soap and water should be used preferentially if hands are visibly dirty.
- Provide soap and water and alcohol-based hand rubs in the workplace. Ensure that adequate supplies are maintained. Place hand rubs in multiple locations or in conference rooms to encourage hand hygiene.
- Visit the coughing and sneezing etiquette and clean hands webpage for more information.

85.    Also in February 2020, the CDC issued guidance that employers should

"[p]erform routine environmental cleaning" and provided the following guidelines:

- Routinely clean all frequently touched surfaces in the workplace, such as workstations, countertops, and doorknobs. Use the cleaning agents that are usually used in these areas and follow the directions on the label.
- Provide disposable wipes so that commonly used surfaces (for example, doorknobs, keyboards, remote controls, desks) can be wiped down by employees before each use.

86.     Also in February 2020, the CDC issued guidance  that employers should "[a]dvise employees before traveling to take certain steps" and provided guidelines that included:

- Advise employees to check themselves for symptoms of acute respiratory illness before starting travel and notify their supervisor and stay home if they are sick.
- Ensure employees who become sick while traveling or on temporary assignment understand that they should notify their supervisor and should promptly call a healthcare provider for advice if needed.

87.     Also in February 2020, the CDC issued "Additional Measures in Response to Currently Occurring Sporadic Importations of the COVID-19" and provided the following guidelines:

- Employees who are well but who have a sick family member at home with COVID-19 should notify their supervisor and refer to CDC guidance for how to conduct a risk assessment of their potential exposure.
- If an employee is confirmed to have COVID-19, employers should inform fellow employees of their possible exposure to COVID-19 in the workplace but maintain confidentiality as required by the Americans with Disabilities Act (ADA). Employees exposed to a co-worker with confirmed COVID-19 should refer to CDC guidance for how to conduct a risk assessment of their potential exposure.

88.     Also, in February 2020, the CDC provided guidance for "Cleaning and Disinfection for Community Facilities." It stated that when a person suspected of or confirmed to have COVID-19  has been in a facility, a business should take the following steps: "Close off areas visited by the  ill persons. Open outside doors and windows and use ventilating fans to increase air circulation  in the area. Wait 24 hours or as long as practical before beginning cleaning."

89.     Plaintiff's complaints to Amazon in February and March of 2020 requested safety measures consistent with the above guidelines.

**February 2020: Plaintiff's Complaints about the Lack of Covid Safety Precautions**

90.     To Plaintiff, it seemed like he was the main person at JFK8 Workforce Staffing who was raising concerns about the lack of COVID safety precautions at Amazon. He was extremely concerned about this issue because  he is in a high-risk category due to being immunocompromised.

91.     Plaintiff first brought up his COVID concerns during the second week in February, when the pandemic was becoming a major news story. At the time, Amazon staff were required to administer drug tests to job candidates and then send the results to a third-party vendor for analysis. Plaintiff complained to Patel about having to assist with inserting and extracting  mouth swabs and said that the third-party vendor should be administering the tests, not just analyzing the results. Plaintiff also complained to Patel that he was forced to administer the tests in an unsafe manner, using paper towels as gloves to handle the saliva swabs. Plaintiff went to the Amazon  Safety Department to try to get gloves, explaining why he needed them, but was told that  the department did not supply gloves  in the large size he needed and that he would have to buy his own gloves.

92.     Plaintiff complained to Patel about the lack of gloves, masks, and antiseptics on at least four or five occasions. In general, Plaintiff made a lot of noise about the unsafe manner in which he and other staff were required to administer drug tests.

93.     Patel responded to Plaintiff's complaints about administering the drug tests in an unsafe manner as though he was overreacting but told him to use the corporate credit card to get

what he needed to be comfortable. However, Plaintiff was not allowed to make the purchase during work hours, had to shop on his own time, and was not feeling well enough by the second or third week of February to shop. On  March 1, 2020, about two or three weeks after first complaining about having inadequate safety supplies, Plaintiff finally was able to drag himself to BJs, where he opened a BJ's wholesale account in Amazon's name and spent about $200.00 on gloves in all sizes and about $200.00 on hand sanitizer,  hygienic wipes, and miscellaneous office items.

94.     Betancourt was furious when he learned that Plaintiff had spent $400, mostly on gloves, wipes and sanitizers. Even though Betancourt was not supposed to communicate with Plaintiff, Betancourt sent Plaintiff an angry email demanding an accounting. Plaintiff emailed back, telling  Betancourt that staff had been using paper napkins to conduct drug tests. Plaintiff explained that Patel had authorized the expenditure and that Plaintiff had spent the money on gloves in different sizes and other safety supplies.  After this email exchange, Betancourt did not drop the matter. When he next saw Plaintiff in person, Betancourt spoke to Plaintiff about the $400 expenditure.

95.     Accordingly, Amazon instead of supplying the kind of basic hygienic materials recommended by the CDC such as hand sanitizer, and in Plaintiff's case, gloves, forced him to purchase such material during his time off and then reprimanded him for spending company money for the supplies.

96.     During the second week in February, after learning that COVID was probably air-borne, Plaintiff raised another concern with Patel. Plaintiff spoke to  her on at least seven or eight occasions, about hiring events at banquet rooms in hotels and other venues where people

26

were packed into rooms with poor ventilation, where no one wore a mask, where there was no social distancing, and where staff had to be in close contact with candidates to get their IDs. It seemed to Plaintiff that Amazon, at the risk of public safety, wanted to disregard information that the disease was air-borne. In this regard, Patel got quite annoyed with Plaintiff when he said that he did not want to go to these hiring events and that he would only do presentations from a distance.

97.     Despite Plaintiff's complaints, Patel scheduled Plaintiff to conduct many hiring events during February and March 2020. At the time, as Patel was aware, Plaintiff was experiencing ailments symptomatic of COVID-19, yet he was forced to travel to various venues and mingle closely with hundreds of people in poorly ventilated spaces, all contrary to CDC recommendations for allowing sick employees to avoid travel and to stay at home separated from others.

98.     During this time, while Plaintiff was ill, he was forced to conduct hiring events involving close contact with hundreds of people at the following venues:

- Hotel Pennsylvania, 34th Street, New York City: approximately 4 or 5 events with people crammed into small rooms without ventilation.

- Hampton Inn, Woodridge, New Jersey: approximately 10 events in the banquet room or in small, crammed rooms that looked like converted hotel rooms.

- EWR5: about 10 events in a packed basement room with humidifiers running.

- Liberty View Industrial Plaza Mall, Brooklyn: about 2 or 3 events.

- FK8: about 6 events in a room with a capacity for 108 people, but the number of people at these events always exceeded capacity.

99.     Plaintiff also brought up the lack of contact tracing. When Plaintiff asked Patel if he would be informed if someone in his department had COVID-19,  she demurred, claiming she did  not  know.  However,  Daisha  Atwell,  an L3  who  worked  in  the  Safety  Department,  told Plaintiff that the information about employees at Amazon who had COVID-19 was confidential. Plaintiff complained to Patel that Amazon was operating as though everything was  normal when it was not. Despite the dearth of information from Amazon, Plaintiff was aware that there was a high rate of absenteeism from speaking with people whom he had hired. Many employees told him that they had decided not to come to work due to the lack of COVID-19 safety precautions or else had been out sick.

100.     Plaintiff worked in close contact with employees who were sick. Plaintiff learned directly  from  his  co-workers  that  the  following  individuals  in  his  work  area  were  sick  during February and March 2020: Erica (surname unknown), an L2; Kris Koller; and Adrienne Wagner, an L3. However, no one at Amazon warned Plaintiff that the people with whom he was working closely had COVID or were sick.

101.     Amazon's  refusal  to  inform  Plaintiff  that  employees  with  whom  he  was  in  close contact  were  sick  violated  CDC  recommendations  that  "employers  should  inform  fellow employees  of  their  possible  exposure  to  COVID-19  in  the  workplace."  In  addition,  Amazon failed to undertake the  procedures recommended  for cleaning a workplace where a  person was suspected of, or confirmed to have, COVID-19. Amazon did not "close off areas visited by the ill persons" and did not "[o]pen outside doors and windows and use ventilating fans to increase air circulation  in the area."

102.    Instead of following CDC guidance encouraging sick employees to stay separated from other employees by remaining at home, Amazon sent out  many blast emails on Chime to Workforce Staffing stating in bolded letters that it was "mandatory" that employees come to work and "mandatory" that they work overtime. Moreover, on or about March of 2020, to deal with the large number of absences, Amazon implemented a policy of paying staff who came to work an extra $2/hour.

103.    In addition to speaking with Patel, Plaintiff also expressed his concerns about COVID during mandatory meetings in  February and March 2020 which took place once or twice a week  at EWR5 in New Jersey and which were  attended by Bettancourt, Patel, and other staff. At these  meetings, Plaintiff either complained about the lack of safety measures at Amazon, *i.e.*,  that there was no ventilation,  that people were crammed together,  and that there was  no hand sanitizer; or else he raised COVID-19 complaints related to there being only one restroom at EWR5 available to the entire staff, as well as to  candidates being processed throughout the day. In violation of CDC guidelines, basic cleaning procedures were not maintained in this bathroom despite the known high incidence of illness at Amazon. Because the bathroom was kept in an unsanitary condition, Plaintiff brought his own Clorox wipes to clean it. At the meeting, people would smirk  or laugh at  Plaintiff's concerns about cleanliness and about COVID-19, making fun of him for being a fastidious gay man.

104.    It is not surprising that at some point in February, Plaintiff got very sick, probably with COVID-19.  He had fever, diarrhea, night sweats, vomiting, difficulty breathing, lost his sense of taste, had extreme exhaustion, and a cough so persistent that it  embarrassed him. He recalls conducting a hiring event in Brooklyn during this time  and coughing so hard that he had

to continually leave the event to use the restroom. He took a few days off but was under a lot of pressure to return to work.

**March 9, 2020: Plaintiff's Public Complaint about being Forced to Administer Drug Tests**

105.    On March 9, 2020, Plaintiff made a public complaint about COVID-19 during a virtual group meeting that took place on Chime. Plaintiff was quite sick on that day. At 9:42 AM, he texted Patel from his desk, stating,  "I'm not feeling so hot," with an emoji of a long drippy face. Ignoring CDC guidance on sick employees, Patel did not advise Plaintiff to leave work and return home.

106.    Right after that, Plaintiff participated in the Chime meeting, along with at least twenty other people, including Betancourt, Cummings, and Patel.  At 9:59 AM, Plaintiff typed into the Chime app,  "Can the DT's [drug test] be outsourced?" At 10:00 AM, Kris Koller, the young lady who sat  across from  Plaintiff in his work area at JFK8,  responded,  "Do you mean during  this  COVID19  situation?"  Koller  added,  "It's  definitely  a  good  thought."  Then  a co-worker, who rotated between JFK8 and New Jersey, wrote at 10:00 AM,    "Absolutely." There was a pause after which Plaintiff typed at 10:01 AM a big red question mark.

107.    At 10:18 AM,  Ricardo Jimenez, a white L4 who worked in the same office area as Patel and Betancourt at EWR5 and therefore would have had an opportunity to receive their off-line reaction to Plaintiff's complaint about the drug testing, wrote that "The drug tests are processed by a 3rd party (ACcurate) so they're technically outsourced by default."

108.    No one replied to this until 11:22 AM when Plaintiff  typed, "Haha...that I know, how about administering or facilitating???" Plaintiff then typed at 11:22 AM, "not by default..."

109.    In response, at 11:31 AM, Jimenez typed a long list of garbled letters, "enettnjuhgnecejilutcjtltvbjnltthcvvtriv," the universal substitute for swear words. Then, at 11:37 AM, Jimenez typed, "Oops."

110.    At 11:56 AM, Plaintiff replied to Jimenez's garbled letters by sending the meeting an emoji of a face with the mouth zipped.

111.    Later that day, at 3:33 PM, Patel, even though she knew that Jamie was very ill that day and had been sick for weeks, wrote to Plaintiff and others on Chime, "Hi! - Saturday is mandatory OT - need full support in NYC at hotel penn." In effect, Plaintiff's supervisor reacted to his earlier text that he was not feeling well and to his public request for outsourcing drug tests with a mandate that he work overtime on the following Saturday, a day he normally had off.

112.    Amazon's lack of concern for Plaintiff's exposure to COVID-19 was all the more egregious because Amazon, through his immediate supervisor, was aware that he had a disability. As mentioned above, when Patel criticized Plaintiff for rescheduling a blind candidate, Plaintiff informed her that he suffered from a disability. She was therefore aware that he was in a high-risk category for COVID.

113.    Under these circumstances, Amazon's failure to provide him with the reasonable accommodations of outsourcing drug testing and social distancing at candidate events constituted disability discrimination and retaliation for his vociferous complaints about the unsafe working conditions at Amazon.

**Termination**

114.    On March 11, 2020, Plaintiff was so ill that he was late for work. When he arrived, Patel and Cummings were waiting for him in a small office.  Plaintiff entered the room sweating, looking disheveled, and feeling, in his words, "hotter than a firecracker."

115.    During the meeting, Plaintiff was given a "Pivot Entry," which is a method Amazon uses to fire employees. In Plaintiff's case, the pivot gave him five days to decide to leave the company with  a severance of $12,000. Alternatively, he could stay and attempt to meet stringent expectations for L4; but, if he failed to do so,  he would be fired after thirty days, and would receive a smaller severance.

116.    When Plaintiff entered the room, he was told that he was being given the pivot because of his performance and because of the three incidents described above for which he received pretextual disciplinary write-ups. Plaintiff then demanded a copy of the pivot. Initially, Cummings told Plaintiff that he was not entitled to a copy of it, but Plaintiff insisted, and, after Patel checked with Bower at Human Resources, Plaintiff was given a copy of the pivot.

117.    When Plaintiff read the pivot, he learned that it was based on his allegedly not meeting L4 performance standards. Plaintiff protested that he had already proven time and time again that he met L4 standards.   He also protested that if there had been any problems in Plaintiff's performance, he would not have been able to  shadow Patel and apply for other positions within Amazon. Indeed, on March 5, 2020, the date that Plaintiff stopped being the POC, he had had an interview for an L5 position that went extremely well, highlighting the pretextual nature of his termination.

118.    The Pivot Entry had  Betancourt's name across the top of it, even though Betancourt was not supposed to have any dealings with Plaintiff. Further, Cummings, the other supervisor who was not supposed to communicate with Plaintiff, was at the termination meeting, urging Plaintiff to sign the pivot and take the severance. Distraught and ill, Plaintiff asked to speak with Patel one-on-one. The two stepped out of the meeting, and Plaintiff told Patel that he knew he was not being given the pivot because of his performance, that he was in good standing, and that he had interviews for other jobs. Patel was in tears, could not look at him, and told him to end all L5 interviews.

119.    After the termination meeting, Plaintiff was given an exit coach,  a "career ambassador" in Amazon terms, who emailed him about his options but did not provide any real help. Plaintiff got in touch with Bowers, the Human Resources Business Partner, who a few weeks earlier had upheld Plaintiff's complaints against Betancourt and Cummings. Bowers was taken aback by Plaintiff's description of the pivot, but said everything was in process for his termination, and Amazon had made its  decision. After that, Plaintiff, who was feeling extremely ill, signed the pivot.  His last day with the company was March 21, 2020.

120.    Ironically, on March 12, 2020, the day after the pivot meeting, Plaintiff received an email from a recruiter thanking Plaintiff for the interview that had gone so well on March 5th. Thus, even after being given the pivot for alleged performance issues, Plaintiff was on track for promotion to L5.

121.    During the week after the pivot meeting, Plaintiff was too sick to return to work, and he remained extremely ill for weeks afterwards. His doctor advised him to stay at home and not be near anyone because Plaintiff's immune system could not handle the possible long-term

complications of exposure. Even though Plaintiff was never tested for COVID-19, he had all of the symptoms of COVID-19. Today, his cough remains persistent, and he suffers from bouts of fatigue.

122.    Because Plaintiff  no longer has health insurance due to his discriminatory and retaliatory termination, he has not been able to get medical treatment for his continuing symptoms or his underlying condition.

**Conclusion**

123.    During Plaintiff's years at Amazon, he  experienced continuous discrimination for being a gay, black man and repeated retaliation for complaining about his discriminatory treatment as a gay, black man. Further, Amazon ignored Plaintiff's reasonable accommodation requests for COVID-19 safety measures even though the company was aware that he was in a high risk category for contracting the disease and even though Plaintiff was complaining about the absence of safety measures recommended by the CDC.  Just a few weeks after receiving a report upholding his complaints of discriminatory treatment and just two days after Plaintiff formally and publicly complained about inadequate COVID safety measures, Plaintiff was informed that he was being terminated and given pretextual reasons for the termination. Therefore, Plaintiff now charges Amazon with extremely serious violations of Title VII,  42 USC § 1981, the ADA, the New York State and New York City Human Rights Law, and the New York State Labor Law.

## COUNT ONE:

### TITLE VII  RACE DISCRIMINATION
(Against Amazon)

124.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

125.    Plaintiff has protected status under Title VII, based upon his race and based upon his gender orientation.

126.    Defendant Amazon subjected Plaintiff to multiple adverse employment actions as detailed above. Similarly situated white employees and straight employees were not subjected to such adverse treatment.

127.    In addition, as detailed above, Defendant Amazon subjected Plaintiff to discriminatory harassment, based on his race and gender, that, as an objective matter, was sufficiently severe and pervasive so as to  alter the conditions of his  employment and create a hostile work environment. No white employees and no straight employees were subjected to such an intolerable hostile work environment.

128.    On March 21, 2020, Plaintiff  was terminated for allegedly failing to meet L4 performance standards, allegedly based on three disciplinary write-ups for violating client obsession policies.  The termination was entirely prextual inasmuch as similarly situated white employees and similarly situated straight employees were not terminated or even disciplined for violating the client obsession policies that Plaintiff allegedly violated and inasmuch as Plaintiff could not have been interviewing and on track for L5 positions if he had any disciplinary issues.

129.    As a  proximate result of the Defendant's discriminatory treatment of Plaintiff on account of race and gender orientation, Plaintiff has suffered physical and emotional injury, loss of benefits and pay, and a diminution in  the quality of his  life, entitling them to actual and compensatory damages.

130.    Plaintiff is also entitled to punitive damages inasmuch as Defendant engaged in discriminatory practices with malice and reckless indifference to Plaintiff's federally protected rights under Title VII. Defendant's ongoing differential treatment of Plaintiff resulting in adverse employment actions, a  hostile work environment, and its intentional establishment of a pretextual record of employment violations to justify Plaintiff's termination, were deliberate, callous, malicious and oppressive, and in disregard of Plaintiff's rights.

## COUNT TWO:

### TITLE VII  RETALIATION
### (Against Amazon)

131.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

132.    Defendant violated Title VII by retaliating against Plaintiff for, on numerous occasions described herein, complaining about and being critical of the discriminatory employment practices of his  employer,  which is activity protected by Title VII.

133.    Defendant subjected Plaintiff to a retaliatory hostile work environment and other adverse  employment actions which culminated in the retaliatory termination of Plaintiff on March 21, 2020.

134.    There was no validity to the actions set forth above that were taken against Plaintiff in retaliation for complaining about discrimination based on race and gender orientation. Plaintiff submits that but for his protected activity, he would not have been retaliated against in the ways set forth above, as there was no factual basis for, and no validity to, the actions taken against him.

135.    As a proximate result of the Defendant's retaliatory treatment treatment of Plaintiff on account of his involvement in activity protected by Title VII, Plaintiff has suffered physical and emotional injury, loss of benefits and pay, and a diminution in the quality of of his life, entitling him to actual and compensatory damages.

136.    The conduct of Defendant was done in conscious disregard of Plaintiff's rights not to be retaliated against for engaging in protected activity. Therefore, Plaintiff is entitled to an award of actual and compensatory damages and expenses to be determined at trial.

137.    Plaintiff is also entitled to punitive damages inasmuch as Amazon engaged in retaliatory practices with malice and reckless indifference to Plaintiff's federally protected rights under Title VII. Defendant's ongoing differential treatment of Plaintiff resulting in adverse employment actions and a hostile work environment and its intentional establishment of a pretextual record of employment violations to justify Plaintiff's termination were deliberate, callous, malicious and oppressive, and in disregard of the Plaintiff's rights.

## COUNT THREE:

### 42 USC § 1981 RACIAL DISCRIMINATION
### (Against All Defendants)

138.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

139.    As set forth herein, Defendants subjected Plaintiff to differential treatment with respect to disciplinary actions, working conditions and benefits, all on account of his race. But for race, Plaintiff would not have suffered the loss of his legally protected rights.

140.    The Individual Defendants, were, as described herein, all personally and intentionally involved in the discrimination, either through direct participation in the violations or through gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that § 1981 violations were occurring, or both.

141.    As a direct and proximate result of the discriminatory acts and omissions of Amazon and of the Individual Defendants, Plaintiff has suffered physical and emotional injury, loss of benefits and pay, and a diminution in the quality of his life, entitling him to actual and compensatory damages.

142.    Plaintiff is also entitled to punitive damages inasmuch as Defendants engaged in discriminatory practices with malice and reckless indifference to Plaintiff's federally protected rights under § 1981. Defendants' ongoing differential treatment of Plaintiff resulting in a hostile work environment and  their establishment of a pretextual record of employment violations to

justify Plaintiff's termination were deliberate, callous, malicious and oppressive, and in disregard of the Plaintiff's rights.

## COUNT FOUR:

### 42 USC § 1981 RETALIATION
### (Against All Defendants)

143.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

144.    As set forth herein, Defendants subjected Plaintiff to differential treatment with respect to disciplinary actions, working conditions and benefits in retaliation for his complaints about differential treatment based on race. But for retaliation in response to Plaintiff's complaints about racial animus, Plaintiff would not have suffered the loss of his legally protected rights.

145.    The Individual Defendants, were, as described herein, all personally and intentionally involved in the retaliation, either through direct participation in the violations or through gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that § 1981 violations were occurring, or both.

146.    As a direct and proximate result of the retaliatory acts and omissions of Amazon and of the Individual Defendants, Plaintiff has suffered physical and emotional injury, loss of benefits and pay, and a diminution in the quality of his life, entitling him to actual and compensatory damages.

147.    Plaintiff is also entitled to punitive damages inasmuch as Defendants engaged in retaliatory practices with malice and reckless indifference to Plaintiff's federally protected rights

under § 1981 not to be retaliated against. Defendants' ongoing differential treatment of Plaintiff resulting in a hostile work environment and their establishment of a pretextual record of employment violations to justify Plaintiffs' termination were deliberate, callous, malicious and oppressive, and in disregard of the Plaintiff's rights.

## COUNT FIVE:

### ADA DISCRIMINATION
### (Against Amazon)

148.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

149.    By the actions described above, among others, Defendant violated the ADA by refusing to provide Plaintiff with reasonable accomodations, inasmuch as  (1) Plaintiff is a person with a disability under the meaning of the ADA; (2) Amazon is covered by the statute and had notice of his disability; (3) with reasonable accommodations, Plaintiff could have  performed the essential functions of this job; and (4) Amazon refused to make such accommodations.

150.    As Defendant is aware, Plaintiff suffers from a physical impairment that substantially limits one or more of his  major life activities compared to most people in the general population. Due to being immunocompromised, he is significantly restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

151.    Plaintiff could have performed the essential functions of his  job with the following reasonable accommodations: (a) the provision of gloves, masks, hand sanitizer, and routine facility cleaning;  (b) outsourcing drug testing to a third party;  (c) the implementation of

40

social distancing during hiring events; and (d) notification of co-workers who were ill. With these accommodations, Plaintiff could have enjoyed equal benefits and privileges of employment as are enjoyed by similarly situated employees without disabilities.

152. By the actions described above, among others, Defendant impeded the interactive process that an employer must invoke in response to a request for a reasonable accommodation. Despite knowing of Plaintiff's disability and of his request for reasonable accommodations, Amazon did not in good faith assist Plaintiff in seeking accommodations when Plaintiff could easily have been reasonably accommodated but for Amazon's lack of good faith.

153. As a direct and proximate result of Amazon's unlawful and discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, harm for which he is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## COUNT SIX:

### ADA RETALIATION
### (Against Amazon)

154. Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

155. By the actions described above, among others, Amazon has retaliated against Plaintiff in violation of ADA, inasmuch as (1) Plaintiff engaged in a protected activity; (2) Amazon was aware of that activity; (3) Plaintiff suffered adverse employment actions; and (4) there was a causal connection between the protected activity and the adverse employment actions.

156.   As Amazon was aware, Plaintiff engaged in protected activity on numerous occasions, by, among other things, requesting reasonable accommodations and complaining that he was not provided with gloves, hand sanitizers, wipes, and social distancing.

157.   As a result of Plaintiff's engaging in protected activity, Amazon terminated him on March 21, 2020.

158.   As a direct and proximate result of Defendant's retaliatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, harm for which he is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## COUNT SEVEN:

### NEW YORK STATE HUMAN RIGHTS LAW
### (Against All Defendants)

159.   Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

160.   As set forth herein, Defendants discriminated and retaliated against Plaintiff based on his race, gender orientation, and disability by, among other things, subjecting him to a hostile work environment, subjecting him to discrete adverse employment actions, and terminating him. These actions are in violation of the New York State Executive Law, § 290, *et seq*.

161.   As set forth herein, Defendants engaged in unlawful discriminatory practices in violation of Executive Law § 290, *et seq*., by wrongly harassing Plaintiff when Defendants subjected Plaintiffs to inferior terms, conditions or privileges of employment because of his race, gender orientation, disability, and/or opposition to discriminatory practices.

162.     The Individual Defendants  are individually liable under the State Human Rights Law inasmuch as they  had the  power to do more than carry out personnel decisions made by others and are therefore directly responsible for discriminating and retaliating against Plaintiff, all   based on his race, gender orientation, disability, and/or opposition   to discriminatory practices.

163.     The Individual Defendants are also liable as aiders and abettors under the State Human Rights Law inasmuch as they aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of New York State Executive Law, Human Rights Law, § 296(6).

164.     As a  proximate result of the Defendants' discriminatory and retaliatory treatment of Plaintiff, Plaintiff has suffered physical and emotional injury, loss of benefits and pay, and a diminution in the quality of his life, entitling him   to actual, compensatory, and punitive damages.

**COUNT EIGHT:**

**NEW YORK CITY HUMAN RIGHTS LAW**
**(Against All Defendants)**

165.     Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

166.     As set forth herein, Defendants discriminated and retaliated against Plaintiff based on his race, gender orientation, and disability by, among other things, subjecting him to a hostile work environment, subjecting him to discrete adverse employment actions, and terminating him.

These actions are in violation of the New York City Human Rights Law, NYC Administrative Code §8-107.

167.     As set forth herein, Defendants engaged in unlawful discriminatory practices in violation of NYC Administrative Code §8-107,  by treating Plaintiff less well than other employees when Defendants subjected Plaintiff to inferior terms, conditions or privileges of employment because of his race, gender orientation, disability,  and opposition to discriminatory practices.

168.     The Individual Defendants are individually liable under the City Human Rights Law inasmuch as they had the power to do more than carry out personnel decisions made by others and are therefore directly responsible for  discriminating and retaliating against Plaintiff, all based on Plaintiff's  race, gender orientation, disability,  and/or opposition to discriminatory practices.

169.     The Individual Defendants are liable as aiders and abettors under the City  Human Rights Law inasmuch as they aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of NYC Administrative Code §8-107.

170.     As a proximate result of the Defendants' discriminatory and retaliatory treatment of Plaintiff on account of his  race, gender orientation, and disability, Plaintiff has suffered physical and emotional injury, loss of benefits and pay, and a diminution in the quality of his life, entitling him to actual, compensatory, and punitive damages.

## COUNT NINE:

## VIOLATION OF New York LABOR LAW § 215
### (Against Amazon)

171.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

172.    Labor Law § 200(1) requires that Amazon facilities in New York State "be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places."

173.    Labor Law § 215(1)(a) provides that "[n]o employer... shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer...that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter."

174.    In or around February and March 2020, Plaintiff made reasonable and good-faith complaints to Amazon managers that Amazon had failed to provide reasonable and adequate protection to the lives, health, and safety of its employees.

175.    Plaintiff's complaints constituted protected complaints under the Labor Law.

176.     On March 21, 2020, Amazon terminated Plaintiff's employment.

177.     Amazon terminated Plaintiff's  employment in retaliation for his protected complaints, in violation of Labor Law § 215.

178.    As a result of Amazon's retaliation, Plaintiff has suffered and continues to suffer emotional distress.

179.    As a result of Amazon's violation of Labor Law § 215, Plaintiff is entitled to reinstatement to his former position with restoration of seniority or an award of front pay in lieu of reinstatement, and an award of lost compensation and damages, costs and reasonable attorneys' fees.

<u>**COUNT TEN:**</u>

**VIOLATION OF NEW YORK LABOR LAW § 740**
**(Against Amazon)**

180.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

181.    Labor Law § 740(2)(c) provides that "[a]n employer shall not take any retaliatory personnel action against an employee because such employee... does any of the following:..(c) objects to, or refuses to participate in any [] activity, policy or practice in violation of a law, rule or regulation." An activity covered by this provision is "an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety." Labor Law § 740(2)

182.    In or around February and  March 2020, Plaintiff complained to  Amazon managers that Amazon had failed to provide reasonable and adequate protection to the  lives, health and safety of its employees. At the time of Plaintiff's complaints, Amazon was not complying with the regulatory guidance from the CDC related to the COVID-19 pandemic or with the mandate in Labor Law § 200(1) that Amazon facilities operating in New York State "be

so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places."

183.   Plaintiff's  complaints constituted protected complaints, objections, or refusals to participate under the Labor Law.

184.   CDC constitutes a public body under the Labor Law.

185.   At the time of Plaintiff's  complaints, Amazon's response to the COVID-19 pandemic violated Labor Law § 200 and CDC guidance, both of which  constitute a law, rule or regulation within the meaning of the Labor Law.

186.   Amazon's failure to comply with such law and/or guidance created and  presented a substantial and specific danger to the public health.

187.   On or around March 21, 2020, Amazon terminated Plaintiff's  employment.

188.   Amazon terminated Plaintiff's employment because of his protected objections, refusals to participate, and/or objections, in violation of Labor Law § 740.

189.    As a result of Amazon's violation of Labor Law § 740, Plaintiff is entitled to reinstatement to the same position he held before the retaliatory termination, or to an equivalent position;  the reinstatement of full fringe benefits and seniority rights;  compensation for lost wages, benefits and other remuneration; and  payment by Amazon of reasonable costs, disbursements, and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor and against the Defendants as follows: Plaintiff demands judgment against Defendants for, where applicable, all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, reinstatement, and any other relief or damages permitted by law. It is further requested that this Court grant reasonable attorneys fees, the costs and disbursements of this action, pre- and post-judgment interest as applicable; and any other relief to which Plaintiff is entitled. Plaintiff demands a trial by jury.

Dated: Huntington, New York
February 19, 2021

ANNE LEAHEY LAW, LLC

By _____

Anne C. Leahey
(legal@anneleaheylaw.com)
17 Dumplin Hill Lane
Huntington, New York 11743
(631) 553-3708

## VERIFICATION

STATE OF NEW JERSEY      )

                                       ss.:

COUNTY OF ESSEX          )

JAMIE WILLIAMS, being duly sworn, deposes and says:

I am a party to the within action.  I have read the foregoing Verified Complaint and know the contents thereof; and the same are true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and, as to those matters, I believe them to be true.

_Jamie Williams_

JAMIE WILLIAMS   Feb. 19, 2021

Sworn to before me this
19 day of February 2021

_Carlton Tilley_

NOTARY PUBLIC

CARLTON TILLEY
NOTARY PUBLIC OF NEW JERSEY
Comm. # 50056542
My Commission Expires 3/13/2022

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:  **Jamie Williams**<br>**51 Clifton Ave.**<br>**Apt. C1306**<br>**Newark, NJ 07104** | From:  **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2021-01134** | **Perry Canales,**<br>**Investigator** | **(929) 506-5318** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):**  You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Perry A, Canales

Digitally signed by Perry A. Canales
DN: cn=Perry A. Canales, o=Equal
Employment Opportunity Commission,
ou=New York District Office,
email=perry.canales@eeoc.gov, c=US
Date: 2020.12.29 09:11:26 -05'00'

For _____     12/29/2020

*(Date Mailed)*

Enclosures(s)

**Judy A. Keenan,**
**District Director**

cc:

**AMAZON**
**Jfk8, 546 Gulf Avenue,**
**Staten Island, NY 10314**